

**FILED & ENTERED**

**JAN 28 2014**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY steinber  DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>**NNN PARKWAY 400 26, LLC, a Delaware limited liability company**<br><br>**and all administratively consolidated NNN PARKWAY 400 cases**<br><br>Debtor(s). | Case No.: 8:12-bk-24593-TA and all administratively consolidated cases<br><br>(Jointly Administered with Case Nos.: 8:13-bk-16598-TA; 8:13-bk-16603-TA; 8:13-bk-16608-TA; 8:13-bk-16611-TA; 8:13-bk-16612-TA; 8:13-bk-16614-TA; 8:13-bk-16616-TA; 8:13-bk-16617-TA; 8:13-bk-16706-TA; 8:13-bk-16621-TA; 8:13-bk-16623-TA; 8:13-bk-16627-TA; 8:13-bk-18271-TA; 8:13-bk-16628-TA; 8:13-bk-16633-TA; 8:13-bk-16634-TA; 8:13-bk-16635-TA; 8:13-bk-16636-TA; 8:13-bk-16637-TA; 8:13-bk-16638-TA; 8:13-bk-16639-TA; 8:13-bk-16641-TA; 8:13-bk-16642-TA; 8:13-bk-16643-TA; 8:13-bk-16645-TA; 8:13-bk-16646-TA; 8:13-bk-16696-TA; 8:13-bk-16697-TA; and 8:13-bk-18271-TA)<br><br>CHAPTER 11<br><br>**AMENDED MEMORANDUM OF DECISION DENYING CONFIRMATION OF CHAPTER 11 PLAN AND GRANTING RELIEF OF STAY**<br><br>Date:  January 14, 2014<br>Time:  10:30 a.m.<br>Courtroom: 5B |

The debtors are some 31 affiliated limited liability companies, each of which own undivided tenancies in common (collectively "debtor TICs") in the property commonly known as 11720 and 11800 Amber Park Drive, Alpharetta, Georgia ("the property"). The property is improved by office buildings which have been partially leased. The debtor TICs each hold a percentage ownership in the property, aggregating approximately 86%. There are at least four tenants in common owning the remaining *14%* which are not debtors ("non-debtor TICs"). By earlier order these cases are administratively consolidated.

The plan is opposed by the major creditor in the case WBCMT 2007-C31 Amberpark Office Limited Partnership ("lender"). The lender is owed about $27 million secured by a first mortgage on the property. The lender had actually foreclosed on the property January 3, 2013 but was prevented from consummating that foreclosure by the Chapter 11 petition of the lead debtor, NNN Parkway 400 26, LLC ("lead debtor") representing about a 2.3% ownership of the property. Despite its serious misgivings voiced at the time, this court reluctantly found that, under the teaching of *Harsh Investment Co. v. Bialac (In re Bialac),* 712 F.2d 426 (9th Cir. 1983), the foreclosure was stayed not only as to the lead debtor but as to all of the other TICS as well because reciprocal rights of redemption from the lender's claim were a form of "property of the estate" which would be destroyed by the foreclosure. Consequently, under Ninth Circuit law the foreclosure sale as to the TICS other than the lead debtor was not just voidable, it was void, and so the sale was unwound by the lender. The initial petition was then followed by petitions from the other thirty debtor TICs. This matter first came on for hearing on attempted confirmation of the debtor TICs' plan of reorganization and lender's motion for relief of stay December 19, 2013. Those motions were considered together with motions to value the property and to dismiss. In anticipation of that hearing the court published its tentative decision December 18, 2013 ("tentative") wherein the court outlined several areas of concern it had over the confirmability of the plan. The court now adopts and incorporates herein by reference the tentative, subject to the decision as articulated below. The court will again address each of those major areas of concern from the tentative in light of the evidence and arguments of the parties:

**1. Fair and Equitable**

The court at the December 19 hearing determined that the value of the property for plan purposes was $21 million. Under 11 U.S.C. §506(a) this means the secured claim of the lender was $21 million and the unsecured claim was the approximate $6 million deficiency. The court also determined that a 5.94% per annum interest rate fixed would provide "present value" equal to the remaining $20 million secured claim (after a promised $1 million pay down) for the payments promised under the plan within the meaning of 11 U.S.C. §1129(b)(2)(A)(i). The hearing was continued for evidence and argument on remaining issues to January 13, 2014. At the continued hearing, the debtor TICs reported that their financial backers, ASB Acquisitions and Steelbridge Capital, would still contribute the promised approximate $5.11 million new capital notwithstanding that these findings were at variance with the original conditions for the contribution as previously expressed. Therefore, it appeared that the debtor TICS cleared at least the initial hurdle to plan confirmation described in the tentative.

**2. Absolute Priority Rule**

Because the lender is easily the largest unsecured creditor at around $6 million (in fact, the lender represents about 99.79% of all debt), and Class 5 (of which it is the sole member) has voted against confirmation, there arises an issue under the "absolute priority rule" found at §1129(b)(2)(B)(ii) because the debtor TICs do not propose to pay the unsecured creditors in full but would keep their interests as Class 8 under the plan. As discussed in the tentative, the debtor TICs could still confirm the plan *if* they could show contribution of sufficient "new value" within the teaching of the U.S. Supreme Court in *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship,* 526 U.S. 434, 456-57, 119 S. Ct. 1411, 1424 (1999). *LaSalle* requires that the quantum of new value be market tested; otherwise the parties and the court cannot know whether the amount of new value proposed in the debtor's plan is the most available. And if more (or better) could be gotten elsewhere, then the equity is effectively keeping a form of property or interest in the debtor despite not paying the dissenting creditors in full, by exercising its exclusive "option" to direct/determine the source of the new value. But

1  *LaSalle* is frustratingly vague as to what exactly a debtor must do to "market test" the interest;
2  the Supreme Court expressly left the question open while naming some alternatives, such as the
3  right to bid for the same interest or the right to file a competing plan. *Id*. at 458

4  The debtor TICs argue they have effectively met the *La Salle* suggestion of ability to file
5  a competing plan as one means of "market testing" because, at least as to the lead debtor, the
6  exclusivity period found at 11 U.S.C.§1121(b) had lapsed.  Therefore, the debtor TICs argue, the
7  lender could have filed a competing plan. This argument is not persuasive because the
8  exclusivity period as to several other of the debtor TICs had not passed when the plan was filed
9  (which triggered the further period found at §1121(c)(3)), and any meaningful reorganization of
10 these interests would require that they *all* be addressed (and the non-debtor TICs as well, as
11 discussed below).  Attempting to deal with 31 separate debtors piecemeal would be at best an
12 awkward, expensive and largely hopeless exercise. This cannot be an effective means of "market
13 testing" within the holding in *LaSalle*. Nor is the court persuaded by counsel's argument in his
14 summation that had the lender confirmed a competing plan in the lead case it would have thus
15 obtained a blocking position preventing 100% ownership of the property by tying up 2.3%.
16 There is a vast difference between a strategy and market testing.  Such a strategy might have
17 worked, assuming that the debtor TICs' new money source continued to insist on 100% control,
18 but could also easily have been an expensive waste of resources had that condition changed.

19 As a fallback position, the debtor TICs filed the last-minute declaration of Nick
20 Montague, a director at Breakwater Equity Partners ("Breakwater") on January 10, 2014.
21 Breakwater is a workout consultant retained by the debtor TICs in February 2012. [Exhibits 23
22 and 129]  To overcome the problem that the Montague declaration was outside the original
23 deadlines set by the court, the lender agreed to an impromptu cross examination of him January
24 13, 2014 without having previously had an opportunity either to see the declaration or conduct
25 discovery regarding same.  Even so Mr. Montague did not fare well.  It developed he has been
26 employed by Breakwater for only four years, that he had no prior or existing experience in
27 "market testing" of reorganization plans and had never testified before concerning plan
28 confirmation, he has had some unexplained involvement with a couple of bankruptcies but he

could not name them, he had not read the *LaSalle* opinion in full and is only vaguely aware of its teaching, he is not an investment banker, he acknowledged that his employer Breakwater's engagement by the debtor TICs [Exhibit 23] did not specifically include this kind of service (i.e. finding multiple sources of investment money or marketing), no investment packages or "data rooms" as are usually utilized when soliciting an equity investment were done, no documents whatsoever were identified as having been disseminated to possible investors with the possible exception of the debtor TICs' appraisal, and at best Breakwater contacted about twenty unidentified entities from its contacts list, probably by telephone (although some of these may have been referred *to* Breakwater), of which an unidentified subset of seven expressed some level of interest and saw some additional information beyond the appraisal via an internet "drop box." No contact log was kept. No advertisements of any kind were undertaken either in California, Georgia or nationally, whether in commercial real estate investor-oriented magazines or otherwise. It develops that Breakwater knew Steelbridge from before and has another deal pending with Steelbridge, but it has not consummated that one either.

     While the court is satisfied that some desultory effort was made by Mr. Montague and maybe by other Breakwater personnel to find an investor, the court does not find that it was the kind of careful, extensive and focused effort that would have been necessary to fulfill the requirements of *LaSalle.* Moreover, once the Steelbridge entity was identified it appeared from Mr. Montague's testimony that all efforts to find a better source effectively ceased. It appeared to the court that once *any* viable money source of money was identified the efforts focused instead entirely in working out the terms of this lone deal (reportedly it was thought unadvisable "to have too many investors in the same room"?). We are left only to raw surmise whether of the tens of thousands of persons and entities potentially involved in commercial real estate in this country and internationally, these twenty unnamed Breakwater contacts represent even a reasonable percentage, much less a viable cross section, of that group.

     Despite a lack of guidance in *LaSalle* other courts have provided some modest detail regarding the appropriate standard. First, what is required to meet the threshold "market test" must be evaluated on a case by case basis. *In re Union Fin. Servs. Grp., Inc.*, 303 B.R. 390, 426

(Bankr. E.D. Missouri 2003). In *Union Financial*, the court found that efforts of an independent special committee, separately represented by counsel, in soliciting participation from 137 firms, including most of the leading equity, financial services and investment banking firms, over a reasonable bid period, was adequate to meet the *LaSalle* standard. *Id*. at 425-26.  In contrast, talking to only one investor unrelated to the sponsoring investor about the investment opportunity is obviously insufficient. *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 49, n. 19 (Bankr. Del. 2000). Certainly, an appraisal or expert's opinion as to the value cannot alone satisfy the "market testing" of *LaSalle.  H.G. Roebuck & Son, Inc. v. Alter Communications, Inc. (In re Alter Communications, Inc.)*, 2011 WL 2261483 *7(Dist. Md. 2011).  Reaching out to 15 members of a potentially interested community, particularly if those efforts are only pre-petition, is not sufficient. *Id*. at *7 n.7.  Eight cryptic, bare-bones advertisements after the initial plan was on file were also insufficient. *Id*. at *8. This court does not hold that in every case an investment banker must be hired, whose fee is tied to success in finding the most money on the best terms. But engagement of such a person with that goal and motivation would help. The court does not hold that advertisements in targeted local and national newspapers are always required, or that they would even be appropriate in every case. But the court does hold that debtors bear the burden of showing that the new money offered is the most and best reasonably obtainable after some "market testing" in order to cram down over the objections of a non-consenting class of unsecured creditors.  This probably requires, at a minimum, demonstration of a systematic effort designed to "market test" the deal.  Debtor bears the burden of persuasion on that point and that burden is not carried in this case.

### 3. Classification and Consenting Impaired Class

Debtor TICs separately classify the lender's $6 million deficiency in Class 5 from the other class of unsecured claims in Class 4.  Class 4 is reportedly comprised of $43,307 of general unsecured claims and is the sole consenting impaired class (leaving aside the question of "artificial impairment" discussed below).  This only works if the debtor TICs can articulate a reasonable business justification for the separate classification not involving gerrymandering of

the vote. See e.g. *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994) and *Barakat v. Life Ins. Co. of Va. (In re Barakat),* 99 F.3d 1520, 1526 (9th Cir. 1996). Absent a separate classification, the size of lender's non-consenting claim would dwarf the amounts of consenting unsecured creditors, leaving debtor without a consenting class of impaired claims. (See the artificial impairment discussion below). The only business justification offered is that there exists a guaranty of the lender's claim.

Existence of a guaranty has been held in the Ninth Circuit to be grounds for separate classification. *In re Loop 76, LLC*, 465 B.R. 525 (B.A.P. 9th Cir. 2012). However, the court agrees with Judge Wallace in *In re South Loop 2656,* Case no. 8:12-bk-20466-MW (Memorandum Decision and Order Oct. 16, 2013) that the bare existence of a guaranty cannot by itself be determinative unless there is also a showing that the guarantors "are solvent in a meaningful way…" Such a view is logical and consistent with the holdings in *Johnston, In re Loop 76 ,*442 B.R. 713, 724 (Bankr. Ariz. 2010) and *In re 4th Street East Investors, Inc.*, 2012 WL 1745500 *4 (Bankr. C.D. Cal. 2012), [but may be distinct from *dicta* in the BAP decision *In re Loop 76*, 465 B.R. at 541 n. 11 (B.A.P. 9th Cir. 2012)]. In each of the first *Loop* case and *4th Street Investors,* the courts held (or at least discussed) that where a separately classified creditor has an alternative means for recovery through a guaranty, reasonable grounds may exist for holding that such creditors are not substantially similar to classes lacking such alternative means. In *Johnston*, it was collateral owned by an affiliate partially securing the claim and the existence of separate litigation between the parties. *Johnston,* 21 F.3d at 328. But since this entire question of separate classification is one addressed to separating reality from façade, it follows that the basis for the distinction must be one *that is meaningful*. As in *South Loop* this court holds that a guaranty from an *insolvent* guarantor provides nothing meaningful and so it becomes a distinction without a difference and cannot alone support separate classification.

There is a March 26, 2007 guaranty of lender's claim from NNN Realty Advisors, Inc. [Exhibit 107]. However, the debtor TIC's evidentiary showing regarding the strength of this guaranty is so thin as to be almost non-existent. Apparently, NNN Realty Advisors, Inc. is now known as "Daymark Realty Advisors" ("Daymark"). Whether this is the same corporation by

-7-

different name, or a successor in interest, was never made clear in the evidence. The only evidence regarding the issue of Daymark's solvency was derived from the interest rate expert Mr. Farzin Emrani who briefly testified he did some limited research on Daymark some time ago. He reports Daymark has a website. We know that Daymark is involved in litigation because a list of pending actions was shown to the court (although the court did not find an exhibit in evidence on this). Beyond this we have absolutely no information about Daymark or the strength of the guaranty. As in *South Loop 2656* this court holds that the correct standard for separate classification based on a guaranty is if the guaranty provides a meaningful recovery source. No persuasive evidence has been received on this point, and it is the debtor's burden of persuasion.

But debtor TICs argue that even if Classes 4 and 5 were combined into a single rejecting class [lender would comprise over 99.28% of the dollars in such a class], they would still have the all-important consenting impaired class required under 11 U.S.C. §1129(a)(10) based upon the proposed treatment of Class 3, the claim of Ford Motor Credit Co. in the amount of $9,737.76 secured by a truck purchased in September 2012 when the property was already entering or had entered foreclosure. The plan proposes to pay off the truck in 24 monthly payments of principal and interest at a very competitive interest rate. Whether the rate is the same as the contract does not appear in the evidence. The reason for purchase of the vehicle in the first place is murky as some TIC members (or Daymark, the previous manager) apparently believed the truck was unnecessary, the debtor TICs had no place to store the vehicle and, in fact, its purchase was a "Breakwater strategy." [Exhibit 67]

This smells to the court like a device to create an impaired consenting class. Moreover, the parties apparently agree that there are and have been at all times since the petition hundreds of thousands on deposit with debtor TICs' operating account [See Declaration of Ryan Wiedmayer ¶7], so it is entirely unclear why this creditor is impaired at all. A doctrine has emerged that "artificial impairment" is a form of gerrymandering and when abusively used is held to be antithetical to the good faith which must be at the center of any reorganization effort. See e.g. *In re Hotel Assoc. of Tucson,* 165 B.R. 470, 474 (B.A.P. 9th Cir. 1994) citing *In re L&J*

*Anaheim Associates,* 995 F.2d 940, 943 n. 2 (9th Cir. 1993); *In re Willows Convalescent Centers, L.P.*, 151 B.R. 220, 223 (D. Minn. 1991)*; In re Windsor on the River Associates, Ltd.*, 7 F.3d 127, 131-32 (8th Cir. 1993).  The court is not persuaded that the debtor TICs have even a single consenting impaired class not involving insiders as required by 11 U.S.C. §1129(a)(10) when the above principles are considered, and the plan's proposal in "good faith" necessary under §1129(a)(3) is consequently also left very much in doubt.  Debtor bears the burden on this and that burden is not carried.

### 4. Means for Implementation/Feasibility

Debtor TICs must show means for implementation of the plan under 11 U.S.C. §1123(a)(5). Debtor TICs must also show that the plan is not likely to be followed by liquidation or the "need for further financial reorganization" under §1129(a)(11), sometimes called the "feasibility" requirement. But "feasibility" can be read broader to ask simply, "Is this plan even possible"?  It is undisputed that only 86% of the tenants in common on the property became debtors.  Class 7 was created to deal with the interests of the non-debtor TICs, but that is a rejecting class.  It is also undisputed that the new money source, ASB Acquisitions, LLC and Steelbridge Capital, absolutely require a 100% control of the tenancies in common as a precondition to funding the plan. [Exhibits 135 and 133@ p. 25 ¶(k)]   Debtor TICs have proposed that rather than extinguishing the non-debtor TICS as originally appeared in the plan, their interests would now be recognized on a *pro rata* basis with the debtor TICs as part of the new entity structure proposed under the plan. But how exactly do the debtor TICs propose to accomplish this?

Debtor TICs argue that they effectively already own or control the non-debtor TICs because under the plan at page 12 they either utilized a "Call Option" found at ¶11.2 of the Tenants in Common Agreement recorded May 18, 2007 ("TIC Agreement")[Exhibit 163 ] or they would acquire those interests via 11 U.S.C.§363(h) [sale of jointly-held property].  At the confirmation hearing the debtor TICs apparently abandoned any argument that §363(h) would come into play (at least not in the near term), for among other reasons that would require an

adversary proceeding. See FRBP 7001(3).  Instead, debtor TICS argue that they effectively already exercised the Call Option under ¶11.2 of the TIC Agreement and so the interests of the non-debtor TICs are now theirs to dispose of as proposed in the plan.  But the court is not persuaded that this is accurate, or at least not without substantial question, based on the court's reading of the applicable provisions of the TIC Agreement. The court doubts that this and related provisions operate quite as debtor TICs have argued.  As the court reads it, if a super majority comprising at least 66.66 % of the TICS elect they may, after providing a thirty-day right of first refusal to the "Property Manager," purchase the interests of the non-consenting TICs who do not "consent to a sale or refinancing of the property or fail to take action to prevent or cure an event of default…"  Have any of these pre-conditions been fulfilled here?  Everyone seems to assume that the thirty-day right of first refusal was extended to the "Property Manager," but the court has seen no evidence that this occurred.  It may be buried somewhere in the 167+ exhibits, but it was never pointed out to the court.  Nor was it made clear whether the applicable "Property Manager" was Triple Net Properties Realty, Inc. (as appears in the TIC Agreement), perhaps Daymark, or perhaps Wiedmayer & Co., LLC [Exhibit 167] who took over property management in December 2012.  But since everyone seemed willing to proceed under the theory this was a non-issue, the court will look to the next step.

     Debtor TICs argue this plan is an attempt either to "prevent or cure a default…"  Maybe, but lender argues that neither "prevent" nor "cure" applies.  First, it seems the attempt to exercise the Call Option did not even commence until months *after* the default was declared [See Exhibits 154-59 and compare 63].  So it is at least awkward to argue that this was to *prevent* a default. But the debtor TICs might be on firmer ground to argue that this attempted exercise of the Call Option was to "cure" a default.  But lender argues that this plan is not a "cure" in the sense that it would reinstate the loan terms; it is an attempt to rewrite the loan under bankruptcy cram down. Is this a "sale" or "refinancing"?   Again, the answer is "maybe."  Debtor TICs have spent much energy and ink arguing that this plan is not a "sale."  But is it a "refinancing?"  It is not a refinancing in the classical sense of taking out the existing lender with new capital; but there is proposed to be an influx of *some* new capital although only $1 million of the new $5+ million

goes immediately to the lender. So the court is left with the impression that this is a heroic effort to fit a square peg into a round hole.

But, there is more than semantics at stake here because of related sections of the TIC Agreement and other pertinent agreements. As lender has observed, starting at ¶11.3 of the TIC Agreement there is an elaborate mechanism for valuations that seems to require a matching of net proceeds from a sale or refinancing, and ensuing periods for the dissenting TICs to obtain their own appraisals possibly yielding a differing net amount, and even for the possibility of a third appraisal. These provisions make a lot more sense in a situation where there are actual sale or refinance proceeds; not so much here where the net is zero. Everyone seems to proceed on the theory that the $21 million valuation settles all questions, but that is expressly for purposes of the plan only and may or might not govern actions under the TIC Agreement. Suppose another appraisal procured by a non-debtor TIC came in at a higher amount? Debtors seem to argue that this process can be summarily short-circuited because the property has no equity and so the plan gives the non-consenting TICs zero recovery. Or, in the latest corollary, it allows the debtor TICs to dictate through the plan a transfer of the non-debtor TIC interests into a new entity in the plan. Whether this is a reasonable or permissible reading of the TIC Agreement, this court is given no basis to determine and must decline to do so in a summary proceeding, like this confirmation hearing. The debtor TICs might be able in the end make a case for the "spirit" of the Call Option provisions (if not the letter) empowering the result they seek to achieve here. But the court agrees with lender that this summary approach, without the non-debtor TICs even being before the court, may well amount to an unconstitutional taking of property without due process, and may also amount to adjudication over non-estate property for which this court's jurisdiction is at least questionable in a post *Stern v. Marshall* world. See e.g. *In re Cajun Elec. Power Co-Op, Inc.*, 230 B.R. 715, 736 (Bankr. M.D.La. 1999). But even if the court assumed its jurisdiction, it cannot extinguish the rights of the non-consenting, non-debtor TICs over non-estate property for no consideration in such a summary manner (or, for that matter, direct a transfer of same as appears in the latest iteration of the plan). Even the debtor TICs seem to acknowledge this need for a more formal process as evidenced by the filing of their last minute declaratory relief action

*NNN Parkway 400 26, LLC, et al v. NNN Parkway 400 0, LLC, et al* on January 10, 2014 under case no.8:14-ap-01010-TA. Further, the lender has announced it intends to intervene in the adversary proceeding as a third-party beneficiary. This is not a frivolous position since there are several provisions which expressly acknowledge this beneficiary status and appear to give lender at least the right to be heard on exercise of the Call Option, starting with ¶12.15.1 and 12.15.2 of the TIC Agreement and §2.9(g) of the Trust Deed [Exhibit 152]. So, if the Call Option found at ¶11.2 of the TIC Agreement is the linchpin of this plan, its viability is highly doubtful since the adjudication required at the heart of the plan is months and maybe even years away.

### 5. Lender's Credit Bid Rights

The lender may be correct in characterizing the proposed plan as having at least *some* characteristics of a disguised sale. [Plan pp. 12 and 13]. For example, apparently the structure is changing under the plan from a series of TICs into a limited liability company, "TIC, LLC," with ownership in the new entity vesting in a proportional basis with Breakwater receiving a new 15% interest. This new entity in turn will be up-streamed as the junior member of a "newco" LLC including a new managing membership comprised of Steelbridge and ASB Acquisitions on account of their capital and expertise. [Plan p. 13. Lines 14-19; DS p. 25, lines 5-22; see also "Reorganized Debtor" illustration handed out in summation]. Debtor characterizes the transaction as an infusion of new capital in return for shares of the reorganized debtors, but it could also be described as a sort of sale of the TICs and or the property to a single reorganized "newco" with resulting proportional membership interests. If this is a "sale" then the lender is correct to cite §1129(b)(2)(A)(ii), an alternative means of "fair and equitable" treatment which specifically invokes §363(k). That section requires that in any sale of property of the estate through a plan the dissenting secured creditor must be afforded the opportunity to credit bid its claim against the purchase price. Lender has up to a $27 million arsenal of offsetting lien to work

with but is being given no opportunity to own the assets being vested in the new entity by credit bid. Plans that would effect a sale but short circuit the right of a secured creditor's §363(k) to offset cannot be confirmed whether characterized as "indubitably equivalent" or not. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank* _U.S._, 132 S. Ct. 2065, 2070 (2012).

But debtor argues that the plan does not call for a "sale" within the meaning of 11 U.S.C. §§363(k) or 1129(b)(2)(a)(ii), but merely a "transfer" to an entity which is one of several permissible ways to implement a plan. See e.g. 11 U.S.C. §§1123(a)(5)(B) and 1129(b)(2)(a)(i)(I). Both debtor TICs and the lender cite the court to *In re Pacific Lumber*, 584 F.3d 229, 244-45 (5th Cir. 2009). The court in *Pacific Lumber* states the obvious that "every sale of property involves a transfer, but not every transfer is a sale." *Id.* at 245. *Pacific Lumber* involved a plan which provided for a transfer of timberland free of liens to new entities owned by the plan sponsor in return for a cash infusion and other consideration. $510 million cash was paid to a secured creditor which was equal to the court's prior §506(a) determination of its collateral value. The *Pacific Lumber* court ruled that this was indeed a "sale" which might have been controlled by §1129(b)(2)(A)(ii). But the objection by the creditor that it had been denied its credit bidding rights was not sustained by the trial court, and this ruling was upheld on appeal, because the appellate court ruled that the alternatives means for "fair and equitable" treatment described in §1129(b)(2)(A) are not exclusive and the "indubitable equivalent" channel found at §1129(b)(2)(A)(iii) *alternatively* applied in lieu of credit bidding mentioned at §1129(b)(2)(A)(ii). This holding of *Pacific Lumber* is probably no longer good law (at least in part) as it is likely overruled by *RadLAX*. However, it may still provide some insight as to what is, in fact, a "sale" to which credit bid rights clearly apply vs. a mere "transfer," which may not trigger such rights. *RadLAX* unfortunately does not tell us what a "sale" is.

Absent any definitive authority cited by either side, the court believes the test of a "sale" as used in these statutes is whether there is an attempt to pry off the creditor's lien onto cash or other identifiable proceeds, such as in a "free of liens" sale under §363(f). In that context it makes perfect sense to allow the objecting creditor to "credit bid" its lien since it should be a matter of indifference to the debtor (since the lien attaches to the proceeds anyway) and this approach has the great advantage of mitigating judicial undervaluation. But in a case like this one, where the lien is not being pried off but in fact follows the property largely undisturbed (but, admittedly, still judicially determined at $21 million and reduced by $1 million cash under the plan) to a new entity, it makes somewhat less sense to describe the transaction as the same sort of "sale" to which either §§363(k) or 1129(b)(2)(A)(ii) were intended to apply. Lender might still complain that it is being denied the practical ability to mitigate the court's undervaluation of its secured claim, but this argument will always be present in any case where there is a judicially determined valuation, whether confirmation is attempted under any of §§1129(b)(2)(A)(i),(ii) or (iii). So, the court does not find any impediment to confirmation of the plan by reason of §1129(b)(2)(A)(ii).

### 6. Conclusion

The court cannot confirm this plan for the reasons stated. The absolute priority rule and market testing issue, the separate classification and the fact that there may in good faith not be even a single consenting impaired class not involving insiders, and the question of just how the debtor TICs propose legally to control the non-consenting, non-debtor TICs in return for the new money absent protracted litigation, are all formidable barriers to confirmation. None of these barriers appear to be of the sort where the debtor TICs might be able to resolve them within the

near future, thereby justifying more time. This case (at least as to the lead debtor) has now been pending for over one year and the court sees no practical end in sight. Therefore, the court sees no basis for further delay of the lender under 11 U.S.C.§362(d)(2) as there is no reorganization "in prospect." *United Sav'n Assoc. of Texas v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 376, 108 S. Ct. 626, 633 (1988). Counsel for lender shall submit an order for relief of stay on the form mandated by the LBRs and separate orders valuing the property and denying confirmation. The motion for dismissal is deemed withdrawn. This memorandum, and the tentative, shall serve as the writing required under FRCP 52(a)(1).

# # #

Date: January 28, 2014

Theodor C. Albert
United States Bankruptcy Judge